**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

**WILLIE KEY and LUANN**
**KEY,**
                    **Plaintiff,**

            **vs.**                                    **Civil Action No.  2:11-CV-362 TLS-APR**

**UNITED STATES STEEL CORPORATION**
            **Defendant.**

**MEMORANDUM OF LAW IN RESPONSE TO**
**UNITED STATES STEEL'S MOTION FOR SUMMARY JUDGMENT**

Come now Plaintiffs by counsel and state the following for their response to Defendant, U.S. Steel's Motion for Summary Judgment.  The Plaintiff also incorporates its applicable arguments and appendix of Exhibits from its Motion for Summary Judgment originally filed October 1, 2013.  Along with this brief, is also filed a Statement of Genuine Disputes and Exhibits 1-18 in support of the Plaintiffs' response to U.S.Steel's motion for summary judgment.

**I.      INTRODUCTION AND STATEMENT OF THE CASE.**

Willie Key brought this action against U.S. Steel for discrimination and violation of his rights under the American's With Disabilities Act [ADA].  Willie Key filed a charged that U. S. Steel discriminated against him based on his disability, insulin dependent diabetes. KEY claims discrimination on the basis of his disability, insulin dependent diabetes, under the ADA and race under Title VII of the Civil Rights Act.

On September 27, 2011, Willie and his wife Luann filed their Complaint against U. S. Steel and alleged theories of recovery under federal and state law. They alleged U. S. Steel violated the ADA when it failed accommodate KEY's subcutaneous pump, which controls his

1

insulin, by "either reassigning him or moving him to a different job." (See Complaint Defendant's Exhibit 1, p. 3, ¶ 14). They also alleged that U. S. Steel's actions were "pre-textual and were motivated by a desire to discriminate against Willie based on his status as a disabled employee and his race which is nonwhite." (Complaint Defendant's Exhibit 1, p. 5, ¶ 22). Under state law, the Plaintiffs claimed they are entitled to recovery for intentional infliction of emotional distress. (Complaint Defendant's Exhibit 1 p. 5, ¶ ¶ 24-25). Lastly, Luann Key alleged a theory of recovery under "loss of consortium." (Complaint Defendant's Exhibit 1 p. 6, ¶ 26). Willie Key has diabetes, a chronic incurable condition which requires continued self testing for glucose concentrations in the blood and vigilance in connection with dietary restrictions and food intake requirements. Willie is also restricted by his diabetes in his significant life activity of working.  He was qualified to work on the coke battery but cannot do so without a pump helping him manage his diabetes.  Unfortunately, with the high ambient air temperatures, Willie cannot work on the coke battery with an insulin pump.  In order to work he needed an accommodation by U.S. Steel which was denied by the employer.  Then, Willie was fired due to absences that were related to his inability to completely control his diabetes and also based on misstatements of Willie's discipline record.

## II.    STATEMENT OF GENUINE DISPUTES

Pursuant to Local Rule 56-1 the Statement of Genuine Disputes is submitted under a separate document.

## III.   ARGUMENT

### A.    **Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Under Rule 56  the entry of summary judgment is appropriate, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate-in fact, is mandated--where there are no disputed issues of material fact and the movant must prevail as a matter of law. The existence or absence of a genuine issue of material fact involves whether 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'  *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608-09 (7th Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

A party moving for summary judgment initially bears the responsibility of informing the court of the basis for its motion, identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that appear to demonstrate the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325. On issues where the nonmoving party has the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex,* 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.,*

916 F.2d 1254, 1256 (7th Cir. 1990).  However, if the moving party chooses, he may support his motion for summary judgment with affidavits or other materials, and, if there be sufficient evidence to support a conclusion that there are no genuine issues for trial, then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assocs.,* 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(*e*); *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion and enter an order accordingly.  Fed. R. Civ. P. 56(e)(2)(3); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial.'"* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

The court views the facts presented on a motion for summary judgment, in a light most favorable to the non-moving party and draws all legitimate inferences in favor of that party. *See Anderson,* 477 U.S. at 255; *Srail v. Vill. of Lisle,* 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to invade the

province of a jury; that is to say that it is not for the court to weigh the evidence, or judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there are genuine issues of triable fact. *See Anderson,* 477 U.S. at 249-50.

## B. Key has a disability which qualifies for treatment under the ADA.

The elements of having a qualified disability to recover for violation of the ADA and the failure to reasonably accommodate, require Willie to show: (a) that he was or is disabled as defined by the ADA; (b) that his employer was aware of his disability; and (c) that he was qualified for the position in question. *Contreras v. Suncast Corp.,* 237 F.3d 756, 762 (7th Cir. 2001). To survive the defendant's motion for summary judgment on his failure-to-accommodate claim, the Plaintiff must present evidence that, if believed by a trier of fact, would show that (1) he is a qualified individual with a disability; (2) U.S. Steel was aware of his disability; and (3) U.S. Steel failed to reasonably accommodate that disability. See, e.g., *King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008). Key satisfies all three elements. *Ekstrand v. Sch. Dist. of Somerset,* 583 F.3d 972 (7th Cir. 2009). Willie's diabetes qualifies him for a disability within the meaning of the ADA. It can hardly be credibly argued that Willie's insulin dependent diabetes is not a qualified disability. As stated in the Plaintiff's opening brief it can not be reasonably considered an issue of fact. It is established as a matter of law.

## 1. Key is qualified for the job but for his disability.

Under the ADA, a disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In this case, according to Dr. Zeitoun's affidavit, Willie's diabetes and its management created a

5

major limitation to life activities.  Exhibit 7, Affidavit Dr. Zeitoun.

Willie's diabetes greatly affected his life activities.  In *Lawson v. CSX*, 245 F.3d 916 (7th

Cir. 2001), the court stated, "[w]e have no difficulty concluding that [the Plaintiff's] insulin-

dependent diabetes and his related medical conditions are physical impairments under the Act."

As noted in Dr. Zeitoun's affidavit, Willie must test himself daily and administer insulin

depending on the results of that testing.  If a test shows a drop in glucose levels, then to avoid

diabetic shock he must stop all activities and eat something to raise the levels.  If Willie does not

eat he will experience disabling episodes of dizziness, weakness, loss of mentation and

concentration.  Like the plaintiff in *Lawson,* Willie cannot just eat when he wants to but rather

must monitor his blood glucose and eat accordingly.  *Id.* at 923-924.

In addition, the above conditions of dizziness and possible unconsciousness could

seriously affect Willie if they occurred while Willie was on the job at the coke battery.  See

Exhibit 1- Penman Deposition, pp. 16:17–18:5. Willie, if in a diabetic spell, could be a danger to

himself or others. *Id.*  Furthermore, the Federal Regulations have been updated and indicate a

number of major life activities and specific disorders that qualify as a disability under the law.

> (i) Major life activities --
>> (1) In general. Major life activities include, but are not limited to:
>> (i) Caring for oneself, performing manual tasks, seeing, hearing, ***eating,*** sleeping,
>> walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning,
>> reading, concentrating, thinking, communicating, interacting with others, and
>> **working**; and
>> (ii) The operation of a major bodily function, including functions of the immune
>> system, special sense organs and skin; normal cell growth; and digestive,
>> genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory,
>> cardiovascular, ***endocrine,*** hemic, lymphatic, musculoskeletal, and reproductive
>> functions. **The operation of a major bodily function includes the operation of
>> an individual organ within a body system**.  29 CFR 1630.2(i)(1)(i)-(ii).
>> [emphasis supplied.]

Note that 'eating,' and 'working,' are both activities that can lead to a qualified disability.  Also in sec (ii), it states specifically that diseases effecting the endocrine system and a major organ, is considered the operation of a major bodily function.  It is beyond argument that Willie has a qualified disability due  to his insulin-dependent diabetes considering Dr. Zeitoun's affidavit and the problems that Willie has had controlling his diabetes.

In addition, there are voluminous records at plant medical that reveal his diabetes and therefore supply information to the employer a record of the impairment that Willie has.  His diabetes was well known to his supervisors, and his boss, Penman who made a later accommodation to have him off of the top of the battery.  Exhibit 1 - Penman Deposition, pp. 37-40; Exhibit 14 - Admissions.  In *Czubak v. U.S. Steel*,  20264 Lexis 16 Am. Disabilities Cas. 266 (N.D. Ind. 2004) the Plaintiff was considered to have a disability because his employer accommodated the disability by giving him a parking pass enabling the employee to park close to alleviate his problems with walking long distances.  Thus regardless of how the disability is analyzed, Willie was disabled under the ADA.

U.S. Steel makes much of whether or not Willie can prove that he is limited in a major life activity.  The major life activity is eating which is the result of an endocrine disease called diabetes, that is a condition resulting from problems with pancreatic function.  As stated in Dr. Zeitoun's affidavit, Willie must test himself numerous times during the day and then if he undergoes a drop in blood sugar he must eat immediately.  Exhibit 7 - Affidavit Dr. Zeitoun.  The questions being suggested by U.S. Steel as to whether or not he has limitations are factual, and U.S. Steel's argument that the matter must be reviewed on a case by case basis merely hastens the conclusion that a jury is necessary to determine the nature of his disability and thus a fact

issue exists.

By contrast to the rest of the population, Willie's insulin dependent diabetes does not allow him to eat where and when he desires. Exhibit 7, Affidavit Dr. Zeitoun;  Exhibit 15 -  Key Dep. p. 97-99.   He must be mindful of how his exertion during work will affect his blood glucose levels.  Willie must be constantly mindful of the availability of food and the type of food available to eat. Exhibit 7, Affidavit Dr. Zeitoun.   Willie argues that there is no question that he has a disability that limits a major life function as a matter of law based on the affidavit of Dr. Zeitoun.  At the very least there is a question of fact on the issue that should survive Summary Judgment.   The next step is to determine if Willie was qualified for the job.

U.S. Steel desires to take the court into the nuances of the argument that there are limited differences between diabetics and their diet.  They describe Willie's condition as simply the need to eat healthier.  This is in grave contrast to Dr. Zeitoun's affidavit where it says that it is very difficult for Willie to control his diabetes. One action taken by the Doctor was to implant an insulin pump to better maintain his diabetes. The "diet to lose weight argument" presented here by U.S. Steel misses the mark by a long shot when contrasted with the affidavit of Dr. Zeitoun and the facts of this case which led Zeitoun to implant the insulin pump.  Exhibit 7 - Affidavit Dr. Zeitoun.  Thus, in respect to the cases cited by U.S. Steel, this is much more in line with the facts of *Lawson v. CSX*, 245 F.3d 916 (7th Cir. 2001) where the interference in the patient's life was very similar to that evidenced here by Willie's attempts at managing his diabetes.  It would appear that not only is Willie's diabetes such that a reasonable juror could find he has a disability that limits a substantial life activity and function,  it would appear that the evidence of Willie's disability is sufficiently strong that his disability should be determined as a matter of law. In

8

other words, no reasonable juror could conclude that Willie Key's diabetes does not limit his major life activity of eating.

Furthermore, working at his job that he was trained for and for which he has found to be particularly demanding in light of his insulin dependent diabetes, would also be a major life activity in which he is substantially limited.  As indicated above, working is a major life activity defined in the ADA regulations.   Willie had an insulin pump implanted in order to better manage his diabetes.  Willie stated that he was never accommodated in connection with the pump even though others were accommodated.  The failure to accommodate makes Willie's ability to manage his diabetes more difficult.  When his diabetes is not properly managed he misses a lot of work days.  U.S. Steel is now in the position that the very thing they refused to accommodate him on, the insulin pump, was the very thing that would have allowed Willie to better manage his diabetes and be able to work.  Therefore, Willie is disabled due to diabetes limiting a major life function, working, and that if his position at U.S. Steel had been accommodated this limitation would have been eliminated.

The Defendant seems to argue from a pre 2008 standard that followed case law involving *Sutton* and *Toyota*.  However, the 2008 amendments to the ADA seem to have abrogated the strict narrow view of a disability and whether or not a disability resulted in a limitation of a major life activity.  The 2008 amendments to 42 U.S.C. § 12102(1) defines "disability" as follows:

> (1) Disability
> "The term 'disability' means, with respect to an individual--
>> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>> (B) a record of such an impairment; or

9

(C) being regarded as having such an impairment (as described in paragraph (3).

Stated in § 12102(4)(A) is that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."  Section 2(A) defines "major life activities" as follows:

> "For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, ***eating***, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and ***working***." (Emphasis added).

By enacting the 2008 amendments, some courts have determined that Congress repudiated Supreme Court decisions that narrowed the definition of disability, in particular *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)  and *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999). In *Jenkins v. National Bd. of Medical Examiners*, 2009 U.S. App. LEXIS 2660, 2009 WL 331638, *2 -3 (6th Cir. 2009), the Sixth Circuit explained:

>  "In the ADA Amendments Act, Congress made clear that it intends for the ADA to give broad protection to persons with disabilities and that the Supreme Court's holding in *Toyota* is at odds with Congress's intent. Congress stated in the findings of the Act that various Supreme Court holdings 'have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect' with the result that 'lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities.' Pub.L. No. 110-325, § 2(a)(4), (6)."

The Sixth Circuit case *Watson v. Ciena Healthcare Management, Inc.,* U.S. Dist. LEXIS 141872  (2013) determined that Mrs. Watson's hypertension, was a disability and that the Amendments to the ADA effective 2009, resulted in a broadening of the inquiry to include more individuals as disabled and qualifying for protection under the law.

The amendments and the directive from congress, clarifies that Willie's disability of diabetes and his limitation on his major life activities of working and eating are established as a matter of law. The evidence placed in Willie's opening brief, is sufficient to determine that he is disabled in one or more major life functions. The analysis of the definitions and directives from the amendments in effect beginning 2009, establish that diabetes is a disability and that eating and working are major life activities when applying the analysis.

The final argument by the Defendant is that as long as Key stays on his insulin and limits his eating, he does not have any significant dietary restrictions. However, what the Defendant fails to mention is that the problem is not as much the diabetes as it is the inability to manage it. This was discussed extensively by Dr. Zeitoun in his affidavit. The reason for installing a pump to deliver insulin during the day was to better manage his disease. It is the problem with eating that leads to the inability to manage the diabetes consistently.

Moreover, the ameliorative affects of supplying insulin to a diabetic, under the new amendments is not to be considered in connection with determining the definition of a disability. See 42 U.S.C. 12102 (4)(1)(E)(i). "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," such as medication, medical supplies or equipment. *Id.*

Ironically, if U.S. Steel would have accommodated Willie's diabetes by allowing him to keep his pump in, then he could have maintained his blood sugar better and been able to work. He would have been able to work at some other job at the battery like his coworkers who seemed to have been accommodated by management. Considering the facts of this case by favoring broad coverage as directed by Congress, it is clear that Willie Key has a qualifying disability.

Willie is qualified for his job as evidenced by his supervisor's testimony.  In his deposition James Penman, Willie's supervisor, indicated that Willie had passed through his probationary period and was a good worker.  Exhibit 1- Penman Deposition, pp. 45-46.  His testimony was, "Q. So really, if he could control his diabetes, if he didn't have to take off all the time that would make him a better worker?  A. Yes."  Exhibit 1- Penman Deposition, p. 46.  Willie had passed all of his testing and had been passed out of the training phase and into regular employment at the coke battery.   Exhibit 11 - Penman Dep. Supp, pp. 22-23. Therefore, U.S. Steel cannot argue that Willie was unqualified for the position in question because he had worked as an employee on the coke battery since 2006 and had passed all of his certifications for his job.  According to Penman, Willie's supervisor, he was a good worker and passed through the training for six months to get his job.  Exhibit 1 - Penman Deposition, pp. 45-46.

**2. Pretext**

In order for U.S. Steel to argue that excessive absenteeism was the reason for Willie's termination it would have to avoid Willie's claim that such excuse was pretext.  To prove pretext indirectly, Plaintiff must show that U.S. Steel's proffered reason is: (1) factually baseless; (2) not the actual motivation for the discipline; or (3) insufficient to motivate the adverse employment action. See *Davis v. Con-Way Transp. Cent. Express, Inc.,* 368 F.3d 776, 784 (7th Cir. 2004). In fact excessive absenteeism was clearly a pretext, for all three reasons stated above.   U.S. Steel argued that Willie did not perform an essential task of his employment which is showing up for work.  The fact is that Willie had long absences due to his inability to manage his diabetes.  If he is not able to manage his diabetes, being on a coke battery would be very treacherous work when considering the dangers associated with the job.

12

Penman states that the symptoms of someone in a diabetic shock or a reaction are that the person can become almost comatose. They may appear to be awake, but are not coherent to their surroundings. These conditions of dizziness and possible unconsciousness could seriously affect Willie if they occurred while Willie was on the job at the coke battery.  See Exhibit 1- Penman Deposition, pp. 16:17–18:5. Willie, if in a diabetic spell, would be a danger to himself or others. *Id.*  Just as Dr. Zeitoun opined that it would be particularly difficult for a diabetic to be in a dangerous job like working a coke battery. See Exhibit 7 - Affidavit Dr. Zeitoun.  Penman confirms that a worker on the coke battery who is having a diabetic spell or reaction would be a danger to himself and to others. See Exhibit 1- Penman Deposition, pp. 16:17–18:5.  Ironically, it is for just these reasons that Willie had Dr. Zeitoun implant the pump.

 In their brief, U.S. Steel argues that Dr. Gardner, although not Willie's doctor indicated that Willie was having trouble managing his diabetes.   Exhibit 7 - Affidavit Dr. Zeitoun; Exhibit 5 - Gardner Deposition, p. 41:7-12.   According to Dr. Gardner, this was due to Willie's own volition. See Defendants appendix, Dr. Gardner affidavit.  However, Dr. Zeitoun, in his affidavit, makes no such assertion.  Thus, when differing facts and inferences are provided in summary judgment, the non moving party should be given the benefit of the conflict in the evidence and the court should consider it a question of fact.   Clearly Willie raises an inference that his illnesses were directly related to his inability to control his diabetes.  This is confirmed by Willie's own testimony. Exhibit 15 Key Deposition,  p. 91.

At some point in time, U.S. Steel seemed to understand that Willie's absences had to do with whether or not he could control his diabetes. There is an inference that Willie's absences from work, which U.S. Steel goes on discussing for 6 pages in its brief, was not Willie's fault

and were therefore forgiven. Almost all of his discipline due to his absences was removed from his record. Willie Key had been disciplined in the past for absenteeism.  However, the majority of those disciplines were removed from his record. Exhibit 3 - Discipline Actions.[1]  A review of the document shows that almost all of Willie Key's discipline was removed from his record.  The discipline was either removed because it expired after a set period of time or it was removed because the employee was vindicated and the discipline was without merit.  See Exhibit 11 - Penman Dep. Supp, pp 61-67.

Penman, Willie's supervisor for the vast majority of the time when Willie was at U.S. Steel,  seemed quite familiar with the record and commented on how U.S. Steel uses the document. Exhibit 11 - Penman Dep. Supp, pp. 62-63.  Penman testified that some of the removed disciplinary actions were deleted because they were found to be either expired or without merit. Exhibit 11 - Penman Dep. Supp, p. 63:12-18.  While Penman then becomes rather evasive on his knowledge of Willie's discipline and the use of the document, he finally confirms that he had discussed Willie's discipline with others and issued discipline while in his position as Willie's supervisor. Exhibit 11 - Penman Dep. Supp , p. 63:12-18.

This evidence shows that sixteen out of nineteen discipline actions were removed either by expiration or based on a determination that it was without merit in the first place.  Penman confirmed that when these disciplinary actions are removed, for whatever reason, they may not be used to aggravate future discipline. Exhibit 11 - Penman Dep. Supp,  p. 63:19-25.   Naturally, as one would think, the removal is as if the discipline never happened.

---

[1] Exhibit 3-Discipline Actions is admissible as a business record belonging to U.S. Steel. See Exhibit 16 Stasik Dep. Supp. 18-19.

During the deposition, Penman's counsel interjected that perhaps the question of the effect of the removal of disciplinary actions was better addressed by Labor Relations.  Exhibit 11- Penman Dep. Supp.  p. 64:9-15.  Therefore, the questions regarding the Simon HR management Tool [Exhibit 3 - Discipline Actions], were brought up during the labor relations employee, Rita Stasik's deposition. When she was asked about the policy regarding discipline her testimony was that it was all discretionary and was dealt with on a case by case basis suggesting that the policies are not written but rather are oral.   Exhibit 2 - Stasik Deposition, pp. 24-25; See also Exhibit 14 Admissions ¶ 8.  Oral policies are the same as no policy.  When a policy is not written down it can change at any time and be applied based on subjective elements. The aim should be to apply uniform written  policies to avoid the pitfalls of striving to attain equality in employee discipline by treating everyone differently. U.S. Steel's approach creates a moving goal post that almost always leads to arbitrary and capricious results.

U.S. Steel observes a progressive discipline policy, although nothing in the record seems to indicate that even that is a written policy. This means according to the labor relations representative, Rita Stasik, the first time is a warning, the second time is a suspension for one day, then three days and then a five-day suspension.  After that termination is available. Exhibit 2 - Stasik Deposition, pp. 15-16.  In other words, you have basically five strikes before termination could occur. On review of Willie Key's discipline record, it reveals only one past discipline that was still active.  As of Willie's employment in January 2011, the discipline dated 8/21/2008 was the only one that was still active.  Thus, the discipline alleged on 1/7/2011 and 1/21/2011had only one predicate discipline action to support enhancement.

Following the progressive discipline scheme testified to by Rita Stasik of U.S. Steel labor

relations, Willie had one prior discipline and then received two more during the month of January, 2011. This only brings him to the five-day suspension level of discipline, i.e., still one strike away from termination. However, the management used his 8/21/2008 as a five-day suspension; and, despite the fact that the previous incidents that aggravated that discipline to a five-day suspension had been removed or expired, U.S. Steel counted it as having been an aggravated discipline to the final level of a five-day suspension. Again, the suspension of 8/21/2008 was not aggravated to the five-day suspension because it was necessarily egregious; it had to do with the fact that he had been disciplined before. The offense was not being punished with a suspension because of the offense's character, but rather just because he had had the same violation before. However, by January 2011, that prior discipline had been retracted leaving one single disciplinary action taken against Willie by January 2011. Instead of aggravating the discipline handed down in January 2011 by one prior strike, the explanation was that because that previous discipline was a final step, the new violation constituted grounds for termination. In other words, while the prior disciplines were retracted from his record, they were, in effect, still there when it came time to determine Willie's fate.

The labor relations department represented at deposition by Rita Stasik gave only a cryptic explanation of how, despite the removal of Willie's prior discipline, he was still subject to dismissal in January 2011. In January 2011, U.S. Steel by Rita Stasik, chose to hand down the most severe discipline of termination. Stasik, the labor relations representative awkwardly explained that based on the U.S. Steel document which removes a number of disciplinary actions, any new discipline relates back to the previous five-day suspension. Exhibit 2 - Stasik Deposition, pp. 23-25. Because Willie Key had a disciplinary action as of 8/21/08 that had not

16

expired, and was not removed, because it was a five-day suspension at that time, they applied it to any subsequent absenteeism, as if it was his final step. Thus, although the previous aggravation of the 8/21/08 to a five-day suspension had either expired or had been removed, he was still affected by the aggravation of previously removed or expired discipline making him subject to the final step of termination. Compare Exhibit 3 -Discipline Actions, pp. 2355 - 2356 with Exhibit 2- Stasik Deposition, p. 24:12-17. Under this interpretation of the rules, once an employee got to the point of a five day suspension, he would never be able to go back even if his previous discipline expired or was removed. Furthermore, the imposition by the company of discipline was all discretionary. Exhibit 2 - Stasik Deposition, pp. 24:3–25:2.

It is clear at this point that U.S. Steel was intent on firing Willie and would go to whatever lengths it had to in accomplishing it. There was no consideration of affording him a basis for accommodation. The best evidence of the manner that Willie Key's discipline was handled is the testimony by Rita Stasik where she admits the disciplinary situation is left up the company's discretion. Exhibit 2 - Stasik Deposition, pp. 24:22-25:2. Therefore, had they followed their own rules associated with progressive discipline, it appears that the company could not have justified terminating Willie Key. The use of the progressive discipline scheme to justify termination of Willie Key was a pretext.

The Simon HR management Tool, by itself resolves summary judgment and it should be either entered in favor of Willie Key, or at the very least his case should be considered as surviving summary judgment.  In their brief, U.S. Steel argues that Willie's attendance record is "deplorable."  The argument goes on for six pages outlining all of the days of work "missed" by Willie.  It even condescendingly argues that "U.S. Steel recognizes that employees become sick

17

and does not suggest that employees cannot be sick." U.S. Steel Brief p. 10. In spite of all of the time and paper used to set out this argument, U.S. Steel never once attempts to explain or defend its allegations of absenteeism in the face of their own documentation that shows almost all of his disciplinary actions removed from his record. Exhibit 3 - Discipline Actions.

Next, U.S. Steel argues that Willie's absences were not due to his disability. Willie's affidavit indicates that his reason for missing work was due to his diabetes. In addition, contrary to U.S. Steel's argument, Willie **was** absent in January of 2011 due to diabetes. Although U.S. Steel seems to argue that none of Willie's absences were due to diabetes, it explains later that a note from Steel Family Health Care Center, apparently in U.S. Steel's possession, does identify one of Willie's ailments as "mildly uncontrolled diabetes mellitus." See U.S. Steel Brief p. 14. Furthermore, one of its own exhibits to Rita Stasik's Affidavit [U.S. Steel Exhibit 4], is a note from Dr. Bhoraj which is discussed in its brief as "an assessment of 1) acute pharyngitis and 2) UTI ruled out." U.S. Steel Brief p. 14. An examination of this note from Dr. Bhoraj, indicates that Dr. Bhoraj also stated that part of the things he saw Willie for on the day in question was uncontrolled diabetes mellitus. See U.S. Steel Exhibit to Stasik Affidiavit. See also Exhibit 10 - Notes from Doctors.

Willie's ailments in January of 2011 did in fact include treatment for uncontrolled diabetes. The evidence established that he is qualified under the ADA as disabled. In addition, the evidence also establishes that the pretextual reason for termination was factually baseless, not the real motivating factor and insufficient to motivate the adverse employment action of termination. Clearly, the absenteeism was a pretext to the actual reason that Willie was fired which was actually due to his diabetic condition. He was fired because he was in need of a

reasonable accommodation and U.S. Steel was not willing to provide it.

**3.  U.S. Steel was aware of Willie's diabetes and insulin pump.**

Also, it is clear that U.S. Steel was aware of Willie's condition and his need for
accommodation.  First, according to discovery responses, U.S. Steel management,  who
supervised Willie,  were aware that he had diabetes and that he had a pump implanted.  Exhibit
14 - Admissions.  Next, based on the previous section there was proof that U.S. Steel considered
Willie as disabled because it had accommodated Willie's diabetes in the past by changing his
position on the battery. Exhibit 1- Penman Deposition, pp. 37-40; Exhibit 14 - Admissions.
Next, Willie states in his affidavit that he told Penman that he was diabetic and that he had a
pump.  See Exhibit 18 - Key Aff. Supp.  In his deposition Penman confirms his knowledge of
both the diabetes and the insulin pump.  There are voluminous records from plant medical
showing not only that Willie was diabetic but that he needed an accommodation due to his pump.
 Furthermore, it was Penman who was in charge of making a determination of whether or not to
accommodate Willie's diabetes.  Penman admits he was in charge of whether or not to
accommodate Willie Key and made the decision to not accommodate him.

The manner in which U.S. Steel plays their game is by taking the approach that because a
medical condition is kept within the confines of plant medical, and presumably shielded by
HIPPA, then the supervisor in charge of making the determination of whether or not to
accommodate is never advised of the medical condition or disability.  This structural, systemic
ignorance is the manner of defeating the ADA and its application to the employees.  Plant
medical has numerous records about Willie Key.  Key had to continually get passed through
plant medical after his absences in order to be released to go back to work.

The manner that it should have proceeded was that Penman, the supervisor, and/or labor relations should have requested that Willie give them a medical release and then they could have shared all of the records regarding Willie's diabetes and his medical problems due to his diabetes and the compelling need for him to be accommodated in order to properly control his diabetic condition with the insulin pump. See Exhibit 12 -  Accommodation Policies USS, pp. 1481 and 1482.  Glimpses of this procedure are referred to in the various depositions. Penman confirms that it is his job to decide whether or not to accommodate Willie.  Exhibit 11 - Penman Dep. Supp, pp. 29-30. However, he is shown to have been trying to get rid of Willie by using the "Ingrid Manns" method; which is code for a secret way to fire Willie.  Exhibit 8 and 9. This was a discussion between Penman and Labor Relations. Exhibit 1- Penman Deposition, pp. 24-25. Instead of trying to find a job to  accommodate Willie, Penman is plotting with labor relations to fire him.

Penman discusses numerous times he was made aware that Willie had diabetes and even agreed to accommodate him when plant medical requested that he be placed in a different position on "the bench" instead of on the top of the battery.  Exhibit 1 - Penman Deposition, pp. 37-40.  At this time when Penman was still area supervisor, he admitted that Willie had told him about his diabetes.  Exhibit 1- Penman Deposition, pp. 37-38.  On another occasion Penman testified that he knew that Willie had an insulin pump installed.   Exhibit 1 - Penman Deposition, pp. 40-41. The answers to the requests for admissions shows that Willie's supervisors were aware of his medical condition.  Exhibit 14. Thus, there is plenty of evidence that the people who were in charge of determining whether or not to accommodate Willie's job at the coke battery, were aware of his diabetes and the need to accommodate it based on plant medical's request.

20

Furthermore, as labor relations representative admitted, they could have simply obtained a

HIPPA release from Willie to review his medical records in connection with his diabetes. Exhibit

2 - Stasik Deposition, p. 27.  The fact is they wanted him to miss work because that built the

pretextual record which they ultimately used to fire Willie.

There is ample evidence that U.S. Steel either knew of Willie's disability, or considered

him as disabled.  The other explanation was that they engaged in institutional ignorance in the

face of a request from plant medical to accommodate his temperature restriction.  Exhibit 13 -

Accommodation Request.  According to internal written policies of the plant, all compliance

with the disabilities act requirements are intended to be initiated by the employee's supervisor.

Obviously, if the supervisor allows himself to be outside the loop of information, he cannot

initiate the actions necessary to carry out an accommodation. See Exhibit 12 - Accommodation

Policies USS, pp. 1481 and 1482.

**4.  U.S. Steel refused any reasonable accommodation.**

U.S. Steel's own written policies reveal that the executive supervisor of the department is

required to initiate the process for compliance with the ADA.  Specifically, if accommodation is

requested it is up to the department head to investigate the requested accommodation and to meet

with the various other department heads to determine an acceptable accommodation and

implement the internal U.S. Steel ADA policy.  See Exhibit 12 - Accommodation Policies USS.

This is consistent with James Penman's testimony that he was the one who would have had final

say on any accommodation of Willie Key regarding his diabetes.  Exhibit 11- Penman Dep.

Supp, pp. 29-30. However, the remainder of his testimony seems to contrast the written policies.

In regards to his involvement with the query of whether or not Willie's restrictions due to

21

his insulin pump would be accommodated Penman was the main initiator according to both the

U.S. Steel internal policy and according to Penman's understanding.  See Exhibit 12 -

Accommodation Policies USS; See Exhibit 11 - Penman Dep. Supp,  pp. 29-30.  However,

contrary to the policy on accommodation which states that labor relations would be involved in

the discussion on employee accommodation, Penman testified that labor relations was not

involved in his decision. *Id.*  When asked about the policy Penman gave a number of answers to

questions that seemed to indicate that labor relations and the collective bargaining agreement

would be implicated.  He stated his understanding was that if a job came along that was posted,

and another worker's rights were not being violated, then accommodation would be possible.

According to Penman Willie could not be accommodated if it would negatively impact some

other worker's contract rights.  Therefore, instead of being proactive, Penman simply determined

that there would be no way to accommodate Willie.  Exhibit 1-  Penman Deposition, p. 36.

Penman's responses are flawed and a bit disturbing especially in light of U.S. Steel's

stated commitment to provide accommodation to disabled employees in their policies.  Although

Penman gave reasons associated with the collective bargaining agreement, he made two

mistakes. First, despite the policy that says that the labor relations department should be involved

in the decision, he did not consult with anyone in that department.  See Exhibit 1 - Penman

Deposition, pp. 26:16-21.  Secondly, despite the mandate of the policy to accommodate when

possible, he did not take on the task with much rigor.  When asked if he talked to anyone in

management about the possibility of putting Willie in another job, he stated that he had not.

When asked if he had done an inventory of available positions in the mill, he said he had not.

Exhibit 11 - Penman Dep. Supp, pp. 30-31.  Basically, the question was asked of him by plant

22

medical to accommodate Willie and he simply said no. Exhibit 13- Accommodation Request.  In fact, Terra S. Barnett from plant medical requested, by e-mail, the accommodation for Willie on 2/25/2010 at 4:32 P.M. and Penman responded negatively the next day at 6:19 A.M.  Obviously, not much thought went into the decision and obviously no discussions were had with any other departments concerning any other jobs which could accommodate the Plaintiff.   A review of the Penman testimony reveals basically a complete refusal to accommodate.   As explained by Penman, the timing would have to be such that the disabled employee would have to present with the need for accommodation at a time when a job opening that could fit the accommodation needed was "posted" at a time when the disabled person had seniority rights in the position offered.  Exhibit 1- Penman Deposition, pp. 29-39.  When the question of accommodation for Willie came up, Penman did not review the available jobs to see if one was available away from the coke ovens. Exhibit 1- Penman Deposition, p. 31:5-9.  Penman did not talk to any other supervisors to see if they were aware of any jobs that were available. Exhibit 1- Penman Deposition, p. 35:11-15. Penman did not discuss the matter with labor relations.  Exhibit 1- Penman Deposition, p. 29:16-21. The description of how accommodation works at U.S. Steel, at least in Penman's department is a far cry from the policy which states that when issues regarding employees with disabilities and accommodations come up the "executive head of each department or division shall be responsible for initiation, administering, and controlling activities to insure full implementation of this policy." Exhibit 12 - Accommodation Policies USS.

It is also clear that U.S. Steel's accommodation of Willie would not have been unreasonable because others with diabetes were actually accommodated.  While the previous section and the testimony of Jamie Penman seemed to make it unlikely that any U.S. Steel

23

employees would ever be accommodated, the fact is that some were.  The evidence shows that the coke division had a maintenance crew which employed a Paul Peterson who had an insulin pump. According to Penman, Paul Peterson worked in the maintenance division of the coke division and he was not required to be on the battery at all times.  Apparently he had no temperature restrictions but was only on the battery occasionally.   Exhibit 1- Penman Deposition, pp. 33-42.  Another  person named Waytovich was in maintenance and he was accommodated due to his diabetes.  Thus, positions within the coke division were available that would not interfere with Willie's diabetes but he was never offered one. Exhibit 1- Penman Deposition, pp.  41-42.

Ultimately, Willie had to have the pump removed due to the unwillingness to accommodate him in connection with the pump.  The heat and temperature restrictions were too intense for Willie to be on the battery with the insulin pump implanted, so he told his doctor to remove it. He denied removing it voluntarily and stated that he felt compelled to have it removed so that he could go back to work.  Exhibit 15 Key Deposition,  p.167.

**5.  Exhaustion of administrative remedies.**

The next argument from U.S. Steel is that Willie failed to exhaust his administrative remedies by not mentioning U.S. Steel's failure to accommodate him in his EEOC charging instrument. This argument is without merit.  In his initial complaint with the EEOC filed March 1, 2011 it states: "I have been denied a reasonable accommodation in reference to being written up for absenteeism when my disability erupts."  This raises the issue of accommodation about his absenteeism due to diabetes because he was not accommodated in the first place to allow him to have an operational insulin pump automatically injecting insulin into his stomach. The failure to

accommodate was regarding his diabetic condition and to facilitate his ability to manage it.  First,

he was not accommodated to allow him to better manage his diabetes with his insulin pump and

later, once he had it removed, U.S. Steel's refusal to accommodate the necessary sick days to

allow him days off sick when he was trying to manage his diabetes with self injection.  See

U.S.S. Exhibit F.  Second, without the accommodation, Willie had the pump removed and went

back to self injecting which had caused the same problems in the past with regard to management

of the disease.  See Exhibit 6 - Return to Work Authorization, p. 872; Exhibit 4 - Affidavit of

Willie Key.

### 6. The arbitration.

The Defendant places in the record the entire decision from the Arbitration action where

the union and the Company argued the contractual arrangement involving the rules regarding

calling off work.  See U.S.S. Exhibit E. Willie was fired for not following the alleged rules

involved in calling off of work for sickness.  The arbitration centered on January 2011.  The

arbitration was not any sort of bar to Willie litigating his rights under Title VII and the ADA.

Willie filed his lawsuit to enforce federal statutory rights, specifically his rights under

Title VII and the ADA.  An employee may exercise his right to "pursue fully both his remedy

under the grievance-arbitration clause of a collective bargaining agreement and his cause of

action under Title VII." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59 60, 39 L. Ed. 2d 147,

94 S. Ct. 1011 (1974).  "Title VII's purpose and procedures strongly suggest that an individual

does not forfeit his private cause of action if he first pursues his grievance to final arbitration

under the nondiscrimination clause of a collective bargaining agreement."  Id. at 49; See also

*Pryner v. Tractor Supply Co.*, 109 F.3d 354, 363 (7th Cir. 1997)  (motion to stay federal court

proceedings pending arbitration denied because arbitration of a contractual right not to be discriminated against does not preclude enforcement of a statutory right not to be discriminated against); *USW v. Uniroyal Goodrich Tire Mfg.,* U.S. Dist. LEXIS 26218, 16-18 (N.D. Ind. Nov. 10, 2003). Therefore, the arbitration decision is not relevant to this proceeding.[2]  What the Arbitrator found is immaterial and should not be considered.[3]  Key has the right to proceed in federal court to vindicate his statutory rights in front of a jury, a hard fought right only achieved after the 1991 amendments to Title VII. *Pryner* at 362.

### 7.  Proof of discrimination

In order to prevail, Key must show that the employer directly discriminated against Willie due to his disability.   To prove this, Key may simply establish the reason for his dismissal. According to U.S. Steel, the overwhelming basis posed, first to the labor relations people, then to the arbitrator and now here in federal court is Willie's absenteeism.  However, the vast majority of his absentee disciplines were overturned or expired. Exhibit 3 - Discipline Actions, pp. 2355-56.  Therefore, according to U.S. Steel's own rules, those incidents,  removed or expired may not be used to further aggravate contemporary discipline action taken against Willie.  Exhibit 11-Penman Dep. Supp, p. 63:19-25. Thus, basing any present disciplinary action on prior disciplines that were either removed or expired, was improper then and it is improper now.  The discipline

_____

[2] The affirmative defense of the arbitrator's decision was not raised in the U.S. Steel answer. The questions of a collateral *estoppel* or *res judicata* effect are also not presented here because those defenses were not raised as affirmative defenses in U.S. Steel's answer. See U.S. Steel Exhibit 2.

[3] It should also be noted that Exhibit 3 - Discipline Actions, which involved elimination of Willie's prior discipline actions was **not** part of the evidence before the arbitrator.  See Exhibit 18 - Key Aff. Supp.

for absences was either removed due to lack of merit or because they expired.  In either case, it is evidence of discrimination that U.S. Steel would use past absences that were either removed or expired to make a case for termination of Willie Key; especially in light of the fact that those absences were due to Willie's disability of uncontrolled diabetes.

It can be inferred that  U.S. Steel removed the disciplinary actions against Willie because they were due to his disability and therefore improper and without merit.  However, then when it came to arguing for his termination at the various hearings in January and February of 2011, and again at arbitration,  management  used the absences as evidence to support excessive absenteeism and the termination.  U.S. Steel now uses the absences as evidence in an attempt to show Willie is not qualified for his job and further argue that absenteeism was the reason for his firing. The document exonerating Willie of his disciplines for being absent was never provided as evidence during the Arbitration hearing.  The arbitrator never discusses Exhibit 3 - Discipline Actions and never applied the document in defense of Willie's absenteeism.  Exhibit 18 - Key Aff. Supp.  The only conclusion that can be reached is that U.S. Steel terminated Willie Key because of his absenteeism for a disability, that could have been mitigated by an accommodation they were unwilling to make.

The court need simply take U.S. Steel at its word that it fired Willie because of his absences.  The fact that his illnesses and absences were caused by a disability which the employer refused to accommodate results in intentional discrimination.  The Plaintiff has shown prima facie cases on both theories, failure to accommodate and intentional discrimination in violation of the ADA.  Taking all of the inferences and facts and considering them in the light most favorable to the Plaintiff, the court has been presented with issues of fact for the jury.

27

### C.  Title VII

Willie was not accommodated for his illness and disability of diabetes mellitus and the failure to do so had a racial component.  Of the employees that were accommodated, one was a white male.  See Exhibit 18 - Key Aff. Supp.  Thus, based on the evidence it appears that a similarly situated white person was given an accommodation in contrast to Willie who is African American.  To avoid summary judgment on a race discrimination claim brought under Title VII a plaintiff may show discrimination using either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008); *Humphries v. CBOC West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007).   As correctly anticipated by U.S. Steel, Willie cannot offer any direct evidence of discrimination, and therefore offers an analysis based on the so-called indirect method associated with  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See *Fane v. Locke Reynolds*, LLP, 480 F.3d 534, 538 (7th Cir. 2007). Under the indirect method, Willie must establish a prima facie case of race discrimination by showing that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of the protected class  were treated more favorably. See *Fane*, 480 F.3d at 538;  *Matthews v. United States Steel Corp.*, 2010 U.S. Dist. LEXIS 51195, 17-18 (N.D. Ind. May 24, 2010).

U.S. Steel points out that it believes that Willie cannot establish either step two or four. The evidence supporting these elements is already identified in the record.   Willie's prima facie case is that he is an African American and disabled under the ADA.  Second, he was meeting the employers legitimate performance expectations.  This is satisfied initially by the evidence that

Willie had passed his training and probation period to be a coke battery employee. Contrary to the argument of U.S. Steel, Willie's discipline for any prior absences were mostly removed or expired from his record and thus, cannot be used as a basis for arguing that Willie's absenteeism interfered with his employers legitimate performance standards. Willie's complete discipline record was almost wiped clean of all infractions. Suffice it to say that if Willie was not meeting his employer's legitimate performance expectations due to absenteeism U.S. Steel would not have eliminated 16 of Willie's 19 disciplinary actions. To argue that Willie's absenteeism disqualified him for his job would be for U.S. Steel to engage in a battle with itself. Next, there is no question that Willie suffered an adverse employment action from U.S. Steel, as he was fired. Finally, and an element that U.S. Steel takes issue with is whether or not Willie was treated differently than another similarly situated employee who was white.

In Willie's affidavit he specifically cites to a man named Wayotivich, who worked at U.S. Steel, who like Willie, had diabetes and worked in the coke division at U.S. Steel. Penman pointed out that Wayotivich was accommodated for his diabetes related condition and worked mainly in the maintenance division. This leads to the conclusion that whites were accommodated in their disability while nonwhites were not. Based on Willie's prima facie case it is established that his Title VII claim should survive summary judgment.

**D. Intentional Infliction of emotional distress**

Shortly after a grievance hearing on January 24, 2011, Willie became very panicked as a result of Stasik's statements to him about his absenteeism and it occurred to Willie that Stasik was intent on getting Willie fired. Willie reacted by becoming short of breath, cold and felt like he was going to pass out. The staff called 911 and Willie was taken to Methodist Hospital

emergency room where he was diagnosed as having suffered a panic attack.  See Exhibit 17 -

Panic Attack Records.  At the hospital Willie also reported chest pain and tightness and

palpitations. He was sent home and advised to followup with his primary care physician and if

any of his symptoms returned, he was instructed to come back to the hospital emergency room.

This evidence is a snapshot of the turmoil that Willie was going through when he was

having his grievance hearings on his attendance record.  He came to the realization that U.S.

Steel was going to fire him because of his disability.  See Exhibits 17 - Panic Attack Records and

18 - Key Aff. Supp.  At least from September 2010 to February 2012, the discipline continued to

occur and Willie was challenged about every time he called off.  See Exhibits 8 - Email Penman

USS02213 and 9 - Email Penman USS02219.  The supervisors and labor relations were trying to

get him fired.  All of this time, Willie simply wanted to be accommodated to be allowed to work

in a position where his diabetes could be controlled.  Willie felt strongly that it was his right not

to be discriminated against due to his disability.  See Exhibit 18 - Key Aff. Supp.

Where employees are involved certain factors, although circumstantial, tend to make the

case more compelling for intentional infliction of emotional distress.  *Bradley v. Hall*, 720

N.E.2d 747 (Ind. Ct. App. 1999). The tort of intentional infliction of emotional distress arises

when a defendant (1) engages in "extreme and outrageous" conduct that (2) intentionally or

recklessly (3) causes (4) severe emotional distress to another. Doe v. Methodist Hosp., 690

N.E.2d 681, 691 (Ind. 1997) (citing RESTATEMENT (SECOND) OF TORTS § 46 (1965)). n6

It is the intent to harm one emotionally that forms the basis for the tort. *Cullison v. Medley*, 570

N.E.2d 27, 31 (Ind. 1991).  As is the case in most cases that concentrate on intent, circumstantial

evidence is normally the vehicle of proof.

In summary judgment the plaintiff enjoys all reasonable facts and inferences drawn in his favor.  In this case, Willie was under much strain and stress, and it is clear that his supervisors were plotting against him to get him fired.  In *Bradley* the purpose of the employers conduct was reviewed and found to be sufficient to survive summary judgment.  Here the conduct was engaged in by U.S. Steel in order to get Willie fired.  A more malicious purpose cannot be imagined; attempting to cause someone to lose their job and their livelihood and the terrible burden that would place on a person knowing that any day may be his last would tend to be extremely upsetting.  It can also be inferred that this conduct went on for an extended period of time.

The final straw was the outrage in being yelled at and assailed at his hearing for his grievance which was undoubtedly the last straw.  In order to know what Willie was going through mentally, was manifested physically when he fell ill during the hearing and had to be rushed to the hospital with symptoms associated with a panic attack.  Under the summary judgment standard, genuine issues of material fact remain as to Willie's claim for intentional infliction of emotional distress.  Exhibit 18 - Key Aff. Supp.

Wherefore, Plaintiffs pray the court deny U.S. Steel's motion for summary judgment.

Respectfully submitted,

/s/ Brian J. Hurley

Brian J. Hurley, Atty #. 8519-49
DOUGLAS KOEPPEN & HURLEY
P.O. Box 209
14 Indiana Ave. Suite 200
Valparaiso, IN 46383
email: bhurley@dkhlaw.org
tel:  219-462-2126; fax: 219-477-4408

31

## CERTIFICATE OF SERVICE

The undersigned further certifies that on the 15th day of November 2013, the foregoing was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to the following parties indicated on the electronic filing receipt. Parties may access this filing through the court's system.

**M. Cristina Sharp**
UNITED STATES STEEL CORPORATION
Law Department
600 Grant Street Room 1500
Pittsburgh, PA 15219-2800
412-433-2864
Fax: 412-433-2811
Email: mcsharp@uss.com
        gftierney@uss.com

**Terence M. Austgen**
BURKE COSTANZA & CARBERRY LLP
9191 Broadway Suite 600
Merrillville, IN 46410
219-769-1313
219-769-6806 (fax)
austgen@bcclegal.com

**Elizabeth M. Bezak**
BURKE COSTANZA & CARBERRY LLP
9191 Broadway Suite 600
Merrillville, IN 46410
219-769-1313
219-769-6806 (fax)
bezak@bcclegal.com

/s/  Brian J. Hurley